DAVID THORNE,⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀No: 2:09 CV 87
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
MEMBER SELECT INSURANCE⠀⠀⠀)
COMPANY,⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀Defendant.⠀⠀⠀⠀⠀⠀⠀)

## OPINION and ORDER

This matter is before the court on plaintiff David Thorne's ("Thorne") "Motion for Reconsideration" (DE #40) in which he requests the court to reverse its decision which granted summary judgment to defendant MemberSelect Insurance Company ("MemberSelect") on Thorne's claim for bad-faith denial of coverage for a fire that destroyed his house. Although no mention of a "motion for reconsideration" is made in the Federal Rules of Civil Procedure, they are well-known in practice and serve a useful—but limited—purpose. "It is well established that a motion to reconsider is only appropriate where a court has misunderstood a party, where the court has made a decision outside the adversarial issues presented to the court by the parties, where the court has made an error of apprehension (not of reasoning), where a significant change in the law has occurred, or where significant new facts have been discovered." *Broaddus v. Shields*, 665 F.3d 846, 860 (7th Cir. 2011), *overruled on other grounds by Hill v. Tangherlini,* 724 F.3d 965, 967 n.1 (2013).

Thorne argues that two items constituting new evidence have come to light which now at least create issues of fact requiring that a jury decide whether Member Select acted

in bad faith. The standard applicable to bad faith claims in Indiana, as summarized in the court's prior order on summary judgment, bears repeating:

> A claim for bad faith is not generated by every erroneous denial of an insurance claim. [*Erie Ins. Co. v.*] *Hickman*, 622 N.E.2d [515] at 520 [Ind. 1993]. Insurers may dispute a claim in good faith, erroneously deny a claim, fail to diligently investigate a claim, or even breach a contract without committing an act of bad faith. *Id.*; *Allstate Ins. Co. v. Hennings*, 827 N.E.2d 1244, 1250 (Ind. Ct. App. 2005). Bad faith does not exist when an insurer rests its coverage decision upon a rational basis. *Masonic Temple Ass'n of Crawfordsville v. Ind. Farmers Mut. Ins. Co.*, 779 N.E.2d 21, 29-30 (Ind. Ct. App. 2002); *Patel v. United Fire & Cas. Co.*, 80 F. Supp. 2d 948, 958 (N.D. Ind. 2000); *Colley*, 691 N.E.2d at 1261 (insurer not liable for bad faith if it denies liability with a rational, principled basis for doing so).
>
> In sum, as this court, speaking through the Hon. Theresa L. Springmann, J., has explained, "a successful bad faith claim is composed of an objective element (such as the lack of a reasonable basis to deny a claim) and a subjective element (such as the knowledge of the lack of a reasonable basis to deny a claim)." *Balzer v. Am. Family Ins. Co.*, 805 F. Supp.2d 618, 624-25 (N.D. Ind. 2011). To succeed on a bad faith claim at trial, a plaintiff must produce evidence establishing that there was no reasonable basis to deny the claim and that the insurer knew that there was no reasonable basis. *Id.*

(DE #34 at 12.) This is the standard which determines whether Thorne's "new evidence" merits reconsideration of the court's previous ruling.

First, in its prior ruling the court's reasoning in part was based on the fact that MemberSelect's claims investigator, Keith Quintaville ("Quintaville") found it suspicious that Thorne refused to consent to a credit check or to release his cellular phone records. Thorne has now reviewed a recorded interview (which had been requested earlier in discovery but not received) in which Quintaville informed Thorne that he was not a

suspect and that he was not obligated to produce those items ("I would be requesting, and again, you know this is entirely up to you…"). (DE #40 at 9; DE #40-13 at 1.) Thorne argues both that it was not suspicious for him to act consistently with Quintaville's advice, and that it was deceptive for Quintaville to give that advice then consider action in accordance therewith as suspicious.

Member Select argues that the recorded conversation is not new evidence Thorne can now rely on, and that it makes no difference anyway. Obviously, Thorne knew (or should have remembered) that he had given a recorded statement to Quintaville, and so his attorney could have obtained it in time to respond to Member Select's motion for summary judgment. Reconsideration need not turn on that, however, because the statement simply makes no difference. When the statement quoted above from Thorne's brief is read in context (Thorne's Ex. K, DE #40-13), it is clear that the entire interview was contentious, that Quintaville made it clear that he wanted the information, and that Thorne would not provide it. For example, shortly after the quoted statement, Quintaville reiterates "Okay, now I'm requesting that if I send you forms to sign for us to pull credit check and we would like copies of your cell phone bills for the month of February, January and February [sic], would you provide those?" (DE #40-13 at 3.) Thorne responds: "No, not at this time. I'm tired of proving I'm innocent." (*Id*.) Thus, there is no reason to second-guess Quintaville's belief that Thorne's refusal to cooperate was suspicious. Along with all of the other information available to Member Select, such as the fire's suspicious origin,

this "new evidence" provides no additional evidence of bad faith and no reason to reconsider the court's prior ruling.

Thorne's second piece of new evidence is the third page of the Town of Griffith's Police Department's investigative report (DE #40-14), authored by a Detective Mance, which Thorne accuses Member Select's counsel of deliberately withholding during discovery. He draws this conclusion because that page mentions Thorne's refusal to take a polygraph exam—which Quintaville also thought suspicious—and that page of the report appears to be the only place Quintaville could have garnered that knowledge, since Quintaville does not recall talking to the police,[1] Thorne did not mention the refusal during his interview with Quintaville, and it is not mentioned anywhere else in all of the documents Thorne's counsel has reviewed. Thorne argues that with page three of the report at its disposal, Member Select misrepresented the facts to the court to obtain summary judgment because "MemberSelect, could not in good conscience represent to David [Thorne] and the Court that the Griffith Police found David or Scott's [Thorne's brother] activities suspicious – for Griffith Police Detective's investigation found David was in Valparaiso about the time of the fire and Scott was home with his parents the entire evening – and thus could not have lit the fire." (DE #40 at 10.)

Member Select's response is multi-faceted. It asserts that this third page is not new evidence, because the police report was a public document which it had no duty to

---

[1] This is Thorne's characterization, but Quintaville was actually somewhat equivocal. He stated twice that he was unsure whether he did, or did not, speak to anyone in the Police Department. (DE #46-2 at 2-3, dep. pages 21-22.)

disclose and which Thorne himself could have obtained at all times—just as he ultimately did—and so his lack of due diligence precludes him from using the document for reconsideration now. It asserts that the third page reveals nothing new, the substance of the information therein was already known, and speculates[2] that Detective Mance and Quintaville must have spoken before Mance faxed his report to Quintaville in April 2008, so Mance could have mentioned Thorne's refusal to take a polygraph during that conversation. Last, it asserts that it never had the third page of the document produced by Thorne, and never saw it until Thorne's attorney provided it, and so neither intentionally failed to disclose it nor made misrepresentations based on the information contained therein.

As to that last point, MemberSelect attaches to its response as Exhibit A a fax dated April 18, 2008, from Detective Mance to Quintaville, consisting of Mance's report, but without the disputed third-page information.[3] (DE #41-1.) The information added to the third page that Thorne points to now is titled "supplemental narrative" and is dated June 24, 2009: in other words, it did not yet exist when Mance faxed his report to Quintaville. In addition, formatting differences between the report faxed to Quintaville and the one obtained by Thorne's counsel (the first three lines of the third page of

---

[2] "Speculate" is Thorne's characterization, but it could also be said this is a reasonable inference. It is unlikely that Mance would have spontaneously sent a fax to Quintaville without being asked to do so.

[3] To be clear, MemberSelect did produce a report with a third page. The third page which Thorne obtained has additional information added to the third page.

Quintaville/MemberSelect's copy, DE #41-1, are moved to the bottom of page 2 on

Thorne's copy, DE #40-14), also show the report was later updated by Mance. Finally,

MemberSelect's counsel affirm that after receiving the supplemental page from opposing

counsel, they diligently searched their files and determined they had never seen it before.

In his reply Thorne does not reassert his charge that MemberSelect/its counsel

intentionally[4] withheld the document, and the court accepts MemberSelect's explanation.

Simply put, the fact that MemberSelect never had, or relied on, Mance's

supplemental report, is a dispositive reason why it is not evidence that MemberSelect

acted in bad faith, making reconsideration unwarranted. Recognizing this, Thorne takes an

entirely new tack in his reply memorandum:

> MemberSelect's claim that it did not possess the third page of
> the Griffith Police Investigation, but had knowledge of the
> facts outlined therein, presents two new material evidential
> concerns. One, if Keith Quintaville did have a conversation
> with Detective Mance and learned of the polygraph
> information, as MemberSelect speculates in their response to
> Plaintiff's Request to Reconsider, Keith Quentavalle [sic]
> would have recorded such conversation in his investigation
> file. David [Thorne] has diligently requested the entirety of
> MemberSelect's investigation file, and no mention of any such
> conversation is recorded in the disclosed documentation to
> date – indicating a portion of the investigation file was not
> disclosed during discovery. Two, MemberSelect has admitted
> the information contained in the third page of the Griffith
> Police Report is not new to MemberSelect. If the knowledge

---

[4] Thorne does assert that Quintaville's lack of recollection of ever having spoken with the police, along with no indication of his having done so appearing in his investigative notes, means "the logical deduction is still that MemberSelect possessed the third page of the Police Report or has yet to reveal portions of Mr. Quintaville's investigation file." (DE #46 at 8.) The court discusses this further, *infra*.

that Scott Thorne was with his parents the entire evening preceding the fire was known to MemberSelect, how did MemberSelect in good faith deny David's claim and claim to this Court it believed Scott lit the fire at David's direction? If MemberSelect possessed the knowledge that David Thorne was in Valparaiso, as shown on an ATM video, shortly after the emergency 911 call came in regarding the fire, how did MemberSelect in good faith deny David's claim and claim to this court that perhaps David had lit the fire at his Griffith home?

(DE #46 at 1-2.)

Taking the second assertion first—that MemberSelect could not in good faith deny the claim if it already knew that Scott Thorne (plaintiff's brother) was at home, and that ATM video showed David Thorne in Valparaiso—when MemberSelect moved for summary judgment it acknowledged that Quintaville knew that Scott Thorne maintained he was with his parents at the time of the fire (DE #14 at 14); and that according to David, after being notified of the fire he stopped at an ATM in Valparaiso on the way there, which he could prove from banking records. (*Id*. at 9.) Thorne's argument now is that the supplemental police report confirms those facts and proves that neither of the Thorne brothers could have been involved with starting the fire; thus, Quintaville/MemberSelect's knowledge of that confirmation makes the claim denial an act of bad faith.

This interpretation of the supplemental narrative on the third page of the report is unwarranted. Not only does the supplemental narrative conclude that "[d]ue to the current level [of] evidence and absence of any witnesses, charges have not yet been possible in this case," (DE #40-14 at 4), the information therein proves nothing. Although Scott Thorne's father confirmed Scott was at his parent's house, the report does not rule

out that the father fabricated that information to protect Scott (and David). Although ATM video confirms David Thorne was at an ATM in Valparaiso after he was notified his house was burning, just as he stated, Thorne has not shown that Quintaville/MemberSelect knew that it would have been impossible for Thorne to set the fire himself then have time to drive to the ATM (and neither does the court know that now). In addition, the report does not rule out the possibility that Thorne had the fire set by some third person other than Scott, acting at Thorne's direction, even though he told MemberSelect no one else had access to the house. Given all the other information at Quintaville's disposal showing that the fire had been intentionally started by *someone*, and David and Scott's statements under oath that they were the only persons with keys and that the house had been locked and secure, MemberSelect still had reasons to be suspicious even if it knew everything in the supplemental narrative. Therefore, that supplement does not show that there is a question of fact as to whether MemberSelect acted in bad faith.

Thorne's second point is that MemberSelect's position indicates it has not produced its entire investigative file during discovery, which is shown by the fact that Quintaville had to learn about the polygraph refusal from somewhere, and that somewhere is not shown in the file produced; and more specifically, that if Quintaville did learn the information from Mance in a conversation requesting a faxed copy of the police report, that conversation should be documented in a chronological case summary that Quintaville mentioned during his deposition, but which has not been produced. (DE #46-2

at 3 (dep. pages 23-24)). Essentially, Thorne requests to re-open discovery before going to trial. (DE #46 at 6.)

That would be unwarranted. The fact is, all of this information was at Thorne's disposal when he responded to the motion for summary judgment; that is, he had a file showing no source for Quintaville's knowledge that Thorne had refused to take a polygraph; and Thorne knew that Quintaville had mentioned a chronological case summary which had not been produced.[5] A motion for reconsideration is not a vehicle for raising arguments which could have been made earlier, *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 956 (7th Cir. 2013), and that is the case here. More importantly, Thorne has not even hypothesized what might be revealed through additional discovery which would negate all of the suspicious circumstances surrounding the fire and establish the Thornes' non-involvement, and so make MemberSelect lack a rational basis for denying the claim. Thus, the court will not reconsider its ruling on bad faith.[6]

---

[5] This assumes such a document can be produced. Quintaville was not positive. He thought that it was a "data file" that perhaps could be printed, but that he would have to talk to his information technology department to find out. (DE #46-2 at 3 (dep. pages 23-24)).

[6] However, the court will order MemberSelect to supplement its discovery by producing, within 20 days, the chronological case summary mentioned by Quintaville, or an affidavit by a person with knowledge explaining why such a document cannot be produced. The chronological summary might confirm that Quintaville spoke with Mance, tending to confirm MemberSelect's assumptions. Even if it does not, it is difficult to imagine any new information that it might contain casting doubt on MemberSelect's rational basis for denying the claim.

As to this last point—that there are so many suspicious circumstances giving MemberSelect a rational basis to deny the claim that it is difficult to conceive of any information that might change that result—Thorne has one final argument, made in a footnote in his opening brief, (DE #40 at 11 n.3), but expanded upon in his reply:

> MemberSelect makes the argument only David and Scott had access to the property and no sign of a break-in was evident. . . .
>
> The Donan Engineering report and pictures indicate the west facing patio door was nothing but a hole in the wall after the fire was extinguished. (DE 14-8, Pg. 4) Furthermore, the Fire Marshall's report (DE 14-6, Pg. 3), relied on by Quintavalle [sic], admits the house was "OPEN" when the fire department arrived. How MemberSelect could assert as a fact to this Court that no sign of a break-in was evident when one of the access doors and frame was completely destroyed during the fire, and the Fire Marshall indicated the house was "OPEN" is a misrepresentation of the facts MemberSelect had available when they denied David's claim and when they submitted documents to the Court claiming no material facts in dispute.

(DE #46 at 9-10.)

The "Donan Engineering report" states "[a]n opening for a patio door reveals extensive fire damage around it (Photographs 6 and 7)." (DE #14-8 at 4.) Thorne hasn't pointed out where in the record those photos are, and the court cannot find them. Assuming, however, that they do show that the patio door post-fire was nothing but a hole in the wall, that could be all that is meant by the Fire Marshall noting that the house was open when the fire department arrived. Moreover, MemberSelect's argument on summary judgment was based on the fact that during their examinations under oath, both David and Scott testified that they saw no signs of a break-in and that the police never advised

them of a break-in, and that Scott, the last person who had been present at the house in early February or even closer than that to the date of the fire,[7] testified that it was locked and secure when he left. (DE #14 at 11; DE #14-3 at 7, 9 (dep. page 22; 30-31).)

These facts remain undisputed and show that MemberSelect had a rational basis for denying the claim and could, in good faith, make the argument that it did make on summary judgment. Moreover, the Donan Engineering report and the Fire Marshall's report were both available to Thorne at the time he responded to MemberSelect's motion, and all that he is doing now is making–or rehashing–an argument he could have made then, which is an improper basis for reconsideration. *Cincinnati Life Ins. Co.*, 722 F.3d at 956. Thorne's "new" evidence, and the inferences he makes therefrom, do not show the court that a question of a fact exists as to whether MemberSelect acted in bad faith.

Accordingly, plaintiff Thorne's motion for reconsideration (DE #40) is **DENIED**. Defendant MemberSelect is **ORDERED** to supplement its discovery responses within 20 days by producing either the chronological case summary mentioned by Quintaville in his deposition, or an affidavit by a person with knowledge stating that such document does not exist and/or cannot be produced (with an explanation why it cannot be produced.)

**SO ORDERED.**

September 22, 2014

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT

---

[7] Although Scott stated in his examination under oath that he moved out in early February, he also testified in his deposition that he was there a couple of days before the fire occurring on February 24. (DE #24-6 at 3 (dep. p. 18).)